THE HOME BUILDING & LOAN ASSOCIATION OF JOPLIN, MISSOURI, Appellant, v. JOHN H. BARRETT et al., Respondents.

Springfield Court of Appeals, December 4, 1911.

1. **BUILDING AND LOAN ASSOCIATION: Purchase of Real Estate: Authority of Secretary: Bills and Notes.** In an action for balance due on a promissory note, brought by a building and loan association, incorporated under the laws of Missouri, against the defendants, the defendants claimed that at the request of the secretary of plaintiff association and as a favor to said association, they had permitted their names to be used in the purchase of real estate and the making of a loan for which the note was given and which was secured by said real estate and their shares of stock in the association, in order to enable the association to purchase the land at the foreclosure sale, and that it was agreed between the secretary and defendants that defendants were to be in no way personally liable on the note. *Held*, that this defense must fail, first, because it did not appear that the directors of the association were parties to this agreement and the secretary had been given no authority to bind the association, and second, any such agreement, for the purchase of real estate by the association, except in the manner and for the reasons specified by the statutes would be *ultra vires* and void.

2. ———: ———: **Right to Purchase Limited.** Section 3394, Revised Statutes 1909, provides that a building and loan association organized under the laws of this state is empowered to purchase real estate, upon which such corporation may have or hold any mortgage, deed of trust, lien or other interest. *Held*, that by applying the statutory construction, "*Expressio unius est exclusio alterious*," it must be concluded that the legislature intended to prohibit building and loan associations from making purchases of real estate in a general way.

3. **BILLS AND NOTES: Want of Consideration: Payment: Burden of Proof.** In an action on a promissory note, where the defendants in their answer admit the execution of the note, but set up as a defense want of consideration and payment, such defenses being affirmative, the burden of proof is upon defendants to establish them.

4. **BUILDING AND LOAN ASSOCIATIONS: Authority of Officers: Ultra Vires Acts.** The officers and directors of a building and loan association are possessed of such powers as are granted by statute, charter and by-laws and such as are not inconsistent therewith, which are necessary to the discharge of their several offices, but any substantial departure therefrom is *ultra vires*.

5. **CORPORATIONS: Notice: Knowledge: Notice to Director: Adverse Interest of Director.** When a director is acting for himself and adverse to the corporation, especially when committing an independent fraudulent act on his own account, and the facts to be imputed to the corporation relate to this fraudulent act, the notice of such fact to a single director, even when officially engaged in the place of business of the corporation is not notice to the corporation.

6. ———: ———: ———: ———: ———. Knowledge on the part of a single director, while sitting on the board and which knowledge he ought to communicate and which he can properly communicate to his co-directors is knowledge on the part of the corporation as a matter of law, unless such director is acting for himself and adverse to the corporation, or attempting to defraud the corporation, in which case the knowledge acquired by the individual director would not be imputed to the corporation.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair*, Judge.

REVERSED AND REMANDED (*with directions*).

*Haywood Scott* for appellant.

(1) The secretary of plaintiff building and loan association, incorporated under the laws of Missouri, cannot bind the corporation to a purchase of real estate by defendants under a private agreement between one of the defendants and such secretary that such real estate should be held by defendant for the

corporation and that defendants should not be held liable on a promissory note executed by them to the corporation for money loaned them by it, on the security of such real estate, where the corporation had no knowledge or information of such an agreement and where such a single-handed act of the secretary is either *ultra vires* of the corporation or such as is beyond the ordinary functions of his office and therefore would require the consent of the board of directors. Endlich on Building Associations (2 Ed.), secs. 174, 231; Thompson on Corporations (2 Ed.), sec. 1435; Sanders v. Chartrand, 158 Mo. 363; Hammerslough v. Building & Loan Assn., 79 Mo. 85; Savings Assn. v. Nixon-Jones Co., 25 Mo. App. 650; Freeman v. Building Association, 15 S. E. (Ga.) 758; Cobb v. Boom & Lumber Co., 49 S. E. (W. Va.) 1005; Gass v. Association, 95 Pa. 101; Paugborn v. Association, 35 N. J. Eq. 341. (2) The secretary of a corporation is not an officer of general power or authority. He has no power, by virtue of his office, to bind the corporation by contract; accordingly, a contract made by him in its behalf will not be binding on it in the absence of evidence of authority or ratification. Hardware Co. v. Grocer Co., 64 Mo. App. 677; Shoe & Clothiing Co. v. Iron Works, 51 Mo. App. 70; Hyde v. Larkin, 35 Mo. App. 365; Bank v. Hogan, 47 Mo. 474. (3) The plaintiff association, incorporated under the laws of Missouri relating to building and loan associations (now article 8, chapter 33, Revised Statutes 1909), had no power to purchase real estate upon which it neither had nor held any mortgage, deed of trust, judgment, lien or other encumbrance, nor in which it had any interest. R. S. 1909, sec. 3394; R. S. 1899, sec. 1367; Building & Loan Ass'n v. Bank, 54 N. E. 619, 64 L. R. A. 399. (4) Persons dealing with corporation through its agents must take notice of the extent of the agent's authority and the purposes and powers for which the corporation is created. Hotel Co. v. Fur-

niture Co., 73 Mo. App. 135; Building & Loan Association v. Bank, 54 N. E. 619; Hollenback v. Casket Co., 117 Mich. 680, 76 N. W. 119.

*Edgar B. Chestnut* for respondents.

(1) The knowledge possessed by Webster will be imputed to the appellant. 2 Thompson on Corporations (2 Ed.), sec. 1668; Savings Bank v. Thomas, 2 Mo. App. 367. (2) The act being one merely in excess of its powers, and not expressly prohibited by law and the contract having been fully performed, the defense of *ultra vires* is not open to appellant. Grohmann v. Brown, 68 Mo. App. 630; Goodland v. Bank, 74 Mo. App. 365; Winscott v. Invest. Co., 63 Mo. App. 367; Bank v. Trust Co., 187 Mo. 494; Cass Co. v. Ins. Co., 188 Mo. 14; Osmer v. Brokerage Co., 134 S. W. 65; Vaughn v. Building & Loan Association, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. Rep. 761; Endlich on Building Associations (2 Ed.), secs. 278, 279; Kerfoot v. Bank, 218 U. S. 281, 31 Sup. Ct. Rep. 14. (3) The appellant by bringing the suit on the note ratified the act of its directors and is chargeable with knowledge of whatever the directors knew at the time the note was executed. 2 Thompson on Corporations (2 Ed.), sec. 1659.

NIXON, P. J.—This was an action for a balance due on a promissory note. The defense was "that said note was made without any consideration whatever and that there is nothing due on said note." The case was tried by jury, resulted in a verdict and judgment for defendants, and plaintiff has appealed.

Plaintiff is incorporated under the laws of Missouri, article 8, chapter 33, R. S. 1909, relating to building and loan associations, which article is its constitution. Its business is under the control and management of a board of directors. Its officers are a

president, vice-president, secretary, and treasurer. The president and vice-president are required to be members of the board of directors, but any member of the association may be elected secretary or treasurer. The duties of the officers are those which usually appertain to their respective offices. The secretary is required, aside from his usual duties as secretary, to follow the instructions of the board of directors. Its by-laws are in conformity with the article under which it is incorporated, except in one section, viz., section 14 of article 3, the by-laws provide that "if at any time the funds accumulate in the treasury in excess of the demands of the borrowing shareholders, the directors may invest the same in real estate for the benefit of the association or they may loan to persons not members of the association in the manner hereinbefore provided." That portion of the section giving the directors power to invest funds in real estate is in conflict with section 3394, R. S. 1909, which provides: "Any corporation created by or under this article is hereby authorized and empowered to purchase at any sheriff's sale or other judicial sale, or at any other sale, public or private, any real estate upon which such corporation may have or hold any mortgage, deed of trust, judgment, lien or other encumbrance, or in which such corporation may have an interest." The last paragraph of section 7 of article 2 of the by-laws contains the same provisions as section 3394, R. S. 1909.

Section 1 of article 3 of the by-laws conforms to section 3394, Revised Statutes 1909, and provides how loans or advances are made. It provides that the loanable funds of the association shall, at each regular meeting of the shareholders, be offered to such shareholder who shall bid the highest premium for the preference or priority of right to have a loan or advance of a sum equal to the ultimate value of one or more of his shares; such funds to be loaned, first, to mem-

bers on real estate security and pledged shares of the association; second, in case there is a balance of money remaining undisposed of at any regular monthly meeting, the directors may, at their discretion, loan the same to other than shareholders, on real estate security.

Section 4 of the same article conforms to section 3392, Revised Statutes 1909, and provides that for every loan or advance made, a non-negotiable note or a bond secured by first mortgage or deed of trust on real estate shall be given, accompanied by a transfer and pledge of the shares of stock of the member so obtaining the loan or advance. It also provides what shall be recited in the note or bond and mortgage or deed of trust.

The next section provides that attorneys' fees for examining abstracts of title, drawing papers, fees for recording, and all other expenses attending a loan shall be paid by the borrower or deducted from the amount of the loan.

The evidence of John H. Barrett, one of the respondents, shows what took place between him and Mr. Webster, the secretary of the loan association, before the application for the loan in question was presented: "Q. Mr. Barrett, state the facts to the jury relating to that transaction. A. Before this loan was made, Mr. Webster, as secretary of the building and loan association at that time, asked me to use my name for a short time; said he wanted to make a loan on a piece of property, and I says, 'Well' asked him something about what it was for and he says, 'Well, I will see you in a day or two.' And in a day or two he says, 'I would like for you to go over and look at a farm over here Mr. Farwell has.' I says, 'I am not busy, I might go over and look at it.' He didn't say why he wanted me to go and look at the place; I supposed he wanted an opinion from me as to the value of the land or something of that kind, so I went along

with him.  Mr. Farwell was over there with Mr. Webster, and in a day or two after we had been over there, he said they were going to take up a loan or pay off a loan or something of the kind on that property and he wanted to make the deed to me and then have me make a deed of trust to the Home Building and Loan Association and get the money to pay off the mortgage that was against it, or something of that kind.  Mr. Webster and Mr. Farwell and myself went to Webb City and there they had a deed made to me—a quit-claim deed; it had been made up and left at the bank there.  The quit-claim deed was already signed and it was handed over to one of the party and compared with the deed of trust to see that it was describing the same piece of property, both the deed of trust and the deed and Mr. Webster had the checks or these vouchers from the building and loan association; he asked me to indorse them so they could pay the bank, which I did, and turned them back to him.  I don't know but what he laid them down on the desk and I indorsed them.  He took both of them and he took the deed of trust and the quit-claim deed both—took all of it; I got nothing.  I didn't get any of the money from the bank nor from Mr. Webster, none whatever, didn't ask for anything; done it as a favor I considered it to the building and loan association and did not request Mr. Webster or Mr. Paul to make their warrants or any of them payable to me.  The $2500 warrant was handed into the bank with another personal check for $200, making the $2700, the consideration for the deed.  The $200 check was drawn by Mr. Webster on some Joplin bank and was made payable to me.  I supposed he did that to make his records show just the transaction and keep it all together; he made the check for $200 which I indorsed to him again.''

On March 3, 1909, at a regular meeting of the shareholders of the plaintiff association, application

was made for a loan of $3000 to defendant, John H. Barrett, on twenty acres of land in Jasper county. The minutes shows that the priority or right to have the loan was sold, as provided in the by-laws, and that Barrett's was the highest and best bid offered. Subsequently and on March 10, 1909, at a regular meeting of the board of directors of plaintiff association, the application of John H.. Barrett for the loan was approved and ordered made. On March 27, 1909, the following note was executed by defendants, upon which this suit was brought:

"$3000                    Joplin, Mo., March 27, 1909.

"One day after date we or either of us promise to pay to The Home Building and Loan Association of Joplin, Missouri, Three Thousand Dollars, for value received, with interest from date at the rate of eight per cent. per annum, in monthly installments of Twenty Dollars and —— cents; also 20 per cent. premium bid thereon, in monthly installments of Six Dollars and —— cents, and, as collateral security herefor, do hereby transfer and pledge Fifteen shares of stock, numbered 4355, 6, 7, 8, 9, 60, 1, 2, 3, 4, 5, 6, 7, 8, 9, of the 14th series in said association, on which said sum of Three Thousand Dollars has been advanced and loaned, and promise also to pay said association our monthly dues of One Dollar per month on each of said shares of stock so transferred and pledged, together with all fines chargeable upon arrears of any such payments, according to the constitution and by-laws of said association; all above mentioned payments to be made on the first Wednesday of each month, and so continue, unless this loan be otherwise sooner cancelled and discharged, until said shares reach the ultimate value thereof, when the same may be cancelled by said association and applied to the payment hereof.

(Signed)                    "JOHN H. BARRETT,
                            "DORA A. BARRETT."

On the same date (March 27, 1909), the plaintiff issued to defendant John H. Barrett two warrants on its treasurer, one for $2500 and one for $500. Each of these warrants was payable to the order of John H. Barrett and they were issued to perfect the loan which he bid off at the meeting of the association of March 3, 1909. They recited on their face that they were "in full of all claims account of loan 14th series by order of the board of directors, passed March 10, 1909. The $2500 warrant was as follows:

"No. 1644                                    $2500.00
"TREASURER HOME BUILDING AND LOAN ASSOCIATION
          "Of Joplin, Missouri.

"Pay to John H. Barrett or order, Twenty-five Hundred Dollars, in full of all claims, account Loan 14th Series. By order of the Board of Directors, passed March 10, 1909.

"Issued March 27, 1909.

          "W. S. PAUL, Pres.

"Attest:  E. WEBSTER, Sec'y."

Across the front of this warrant appears the following words and figures:
PAID Mar. 29, 1909
"JOPLIN NATIONAL BANK
          "Joplin, Mo."
Indorsed on the back, the following:
"JOHN H. BARRETT."
"PAY ANY BANK OR BANKER
          "Or Order
"Previous Indorsements Guaranteed
"THE NATIONAL BANK
          "Of Webb City, Mo.
"J. P. STEWART, Cashier.
"JOPLIN CLEARING HOUSE
          "March 29, 1909

## "CUNNINGHAM NATIONAL BANK."

The $500 warrant was as follows:

"No. 1643                                $500.00

"TREASURER HOME BUILDING AND LOAN ASSOCIATION

"Of Joplin, Missouri.

"Pay to John H. Barrett or order, Five Hundred Dollars, in full of all claims, account Loan 14th Series. By order of the Board of Directors, passed March 10, 1909.

"Issued March 27, 1909,

"W. S. PAUL, Pres.

"Attest: E. WEBSTER, Sec'y."

Across the front of this warrant appear the following words and figures:

PAID Mar. 29, 1909.

"JOPLIN NATIONAL BANK,

"Joplin, Mo."

Indorsed on the back, the following:

"JOHN H. BARRETT."

These warrants were shown to have been paid by plaintiff, each of them bearing the indorsement of defendant John H. Barrett. The $2,500 warrant was shown to have been indorsed by Barrett and delivered to the National Bank of Webb City, Missouri, in part payment for a tract of land hereinafter mentioned. The $500 warrant Barrett claimed to have indorsed and turned over to Webster, the secretary of the plaintiff association, who gave Barrett his personal check for $200. The other evidence showed that Barrett himself had cashed the $500 warrant at the counter of the Joplin National Bank, the warrant being payable to his order and the only indorsement on it being that of John H. Barrett.

On March 27, 1909, the date of the warrants, the $2,500 warrant and the $200 check were turned over by Webster to the National Bank of Webb City in payment for the 20 acres of land described in plaintiff's

petition, the bank delivering at that time for C. E. Matthews and wife, the owners of the land, a quit-claim deed conveying the same to defendants.

On the same date, March 27, 1909, defendants executed a deed of trust on the land to Arthur B. McAntire, trustee, with plaintiff as beneficiary, to secure to plaintiff the payment of the note sued on herein. The deed of trust contains, among others, the following provisions:

"Now, if the said John H. and Dora A. Barrett shall pay the interest on said note as it becomes due and payable, and pay said dues, premium, fines and penalties, as aforesaid, according to the tenor and effect of said note and the constitution and by-laws of said association, and if the said party of the first part shall pay all taxes and prior encumbrances against the said property when due, keep the buildings thereon insured against loss and damage by fire and tornado for the benefit of the said third party, in good and reliable companies in the sum of —— dollars each, for the period of this loan and the property above described shall be released at the expense of the party of the first part; but if said party of the first part shall fail to pay said taxes and assessment, or said prior encumbrances when due, or keep up said insurance, the party of the third part may pay said taxes, assessments and prior encumbrances, and keep up said insurance, and all sums so expended shall become a debt due additional to the indebtedness aforesaid, and be secured in like manner by this trust deed, and bear like interest, and all sums hereby secured shall be considered due and payable. And likewise if the said John H. and Dora A. Barrett shall fail to pay the interest, premium, dues or fines and penalties, as stockholder, as aforesaid, as they accrue and become due, according to the tenor and effect of said note and the constitution and by-laws of said association, then, in either of said events, this deed shall remain in full

force, and the said Arthur B. McAntire," etc., going on to recite power of sale, etc.

Defendant read these provisions before signing the deed of trust as shown by his own evidence, as follows: "Q. When you signed that note you knew what you were doing; you knew what you were signing, didn't you? A. Yes, sir. Q. You read it before you signed it? A. Yes, sir. Q. You read the deed of trust before you signed it? A. Yes, sir. Q. You knew the contents of both? A. Yes, sir. Q. And in reading the note you read this language: 'And, as collateral security herefor, do hereby transfer and pledge Fifteen shares of stock, numbered 4355, 6, 7, 8, 9, 60, 1, 2, 3, 4, 5, 6, 7, 8, 9, of the 14th series in said association, on which said sum of Three Thousand Dollars has been advanced and loaned, and promise also to pay said association our monthly dues of One Dollar per month on each of said shares of stock so transferred and pledged, together with all fines chargeable upon arrears of any such payments, according to the constitution and by-laws of said association; all above mentioned payments to be made on the Wednesday of each month, and so continue unless this loan be otherwise sooner cancelled and discharged, until said shares reach the ultimate value thereof, when the same may be cancelled by said association and applied to the payment hereof." You read that when you read the note, didn't you? A. Yes, sir.

Defendant John H. Barrett testified that when the quit claim deed conveying the land to himself and wife was delivered to him, he handed it to Mr. Webster, who was, at that time, the secretary of the plaintiff association, and requested Webster to take it and record it for him "along with the deed of trust which he was recording for the Home Building and Loan Association." The deed of trust was recorded March 30, 1909, but the quit claim deed given to defendants was not recorded, and it was several months before

it was recorded and not until defendant Barrett hunted it up and had it recorded. Thiis deed of trust contained, in Barrett's handwriting, the following pencil memorandum: "Register and return to John H. Barrett, 206 Pearl St., Joplin, Mo."

The defendants, having failed for about six months to pay the note, the land was advertised under the deed of trust and at the sale Farwell appeared and notified the bidders that the land was the property of his wife and that the purchaser would buy a lawsuit. Barrett was there at the sale and bid the amount of the note sued on, in order to save himself, as he said, from paying the difference. Having failed. to pay the amount thus bid, the property was readvertised and bid in by the plaintiff association for the sum of $2,000 which was duly credited on the note. On April 1, 1910, the shares of stock were cancelled and the proceeds credited to the defendants, leaving a balance on the note of $1,290.45.

On May 10, 1910, the plaintiff association filed a suit against Farwell and wife, Matthews and wife, Barrett and wife, and Webster and wife, to set aside the quit-claim deed made to Farwell's wife. In this proceeding it appeared that the original quit-claim deed, to Barrett, was delivered at the time of its execution to Webster, and he claimed that it was lost or misplaced but was found and recorded on the 8th day of February, 1910, and that it should have been recorded on the 27th day of March, 1909. Soon after March 27, 1909, Matthews and wife, without any consideration, executed a *second* quit-claim deed, conveying the twenty acres of land, leaving the grantee's name blank, and delivered it to either Farwell or Webster. It was never filed for record. Subsequently, on December 8, 1909, Matthews and wife, without any consideration, executed, and delivered to Farwell, another quit-claim deed to the same land in which the name of the grantee was left blank. Farwell at once inserted

the name of his wife as grantee and had the deed recorded. In such suit, defendants Matthews and wife answered that the other defendants induced them to execute the subsequent deeds upon the representation that the first deed had been lost, and disclaimed title. Defendants Farwell and wife answered claiming title adverse to the plaintiff association. Defendants Barrett and wife answered disclaiming title adverse to the plaintiff. Defendants Webster and wife did not answer. In this action of the plaintiff to have the title of the several parties defendant set aside, a decree was obtained in its favor. The defendant Farwell seems to have been an interested party, closely associated with Webster, and present at the times that most of the transactions took place in regard to the twenty-acre tract of land.

Defendants in their answer in this proceeding admit the execution of the note sued on, but set up in their answer as a defense, want of consideration, and payment. As the defenses pleaded were both affirmative, the burden of proof was upon defendants to establish such defenses. The party pleading payment assumes the burden of proving payment. [Yarnell v. Anserson, 14 Mo. 619; Oil Well Supply Co. v. Wolfe, 127 Mo. 616, 30 S. W. 145.] The note sued on was confessedly executed by the defendants. Being a written instrument for direct payment of money, it imports prima facie a consideration. [R. S. 1909, sec. 2774.]

The real defense to this action is grounded upon the theory that the plaintiff association *purchased* the twenty-acre tract of land from the owner, Matthews, and paid him the $2,700, the purchase price, under the guise of making a loan to the defendant Barrett; that the defendants, at the request of Webster, the secretary of the plaintiff association, as a favor to plaintiff association, were allowing themselves to be used as mere conduits, or as a repository of the title

160 App.—12

of the land until it could be subsequently legally transferred to the plaintiff association under the defendant's defaulted deed of trust; that the defendants at no time had any personal interest in the transaction or received any personal benefit from it, but only loaned their names to the association for an accommodation to it and to enable it to consummate the *purchase* of this tract of land. The principal oral evidence, substantially uncontradicted, was given by the defendant Barrett, and it tended substantially to sustain the defendants' contention and went to show that he practically made such an arrangement with the plaintiff's secretary. The court gave an instruction on this theory of the case, as follows: "If you believe from the evidence that the title to the property described in plaintiff's petition was conveyed to the defendants by Matthews and wife by quit-claim deed, at the instance of plaintiff pursuant to a request theretofore made of defendant, John H. Barrett, by the plaintiff, for the use of the defendants' names as a receptable for the title to said property, and that the consideration recited in said quit-claim deed was paid by the plaintiff or its directors to Matthews, and that no part thereof was paid by the defendants, and that the only act performed by the defendant, John H. Barrett, in connection with the two warrants drawn by the plaintiff and payable to the defendant, John H. Barrett, was the indorsement by the said defendant, John H. Barrett, of his name on the backs thereof, and that the said defendants did not receive the proceeds of said warrants or any part thereof, and that the note sued on was signed without any consideration whatever, then your verdict should be for the defendants." In this instruction the defendants were allowed to recover if this 20-acre tract of land was conveyed to them at the instance of the plaintiff pursuant to a request theretofore made of the defendant, John H. Barrett, by the plaintiff, and upon the further find-

ing by the jury of the fact that the consideration of the quit-claim deed was paid by the plaintiff or its directors to Matthews and wife and no part was paid by the defendants.

The evidence of defendant John H. Barrett further tended to prove that he was not personally present at the shareholders' meeting in which the loan was bid off in his behalf, and that the issue of the fifteen shares of stock in the association was not in the first instance issued to him with his knowledge; that he made no written application for the loan and presented no such application to the subsequent meeting of the directors; that the warrants were not issued at his request, but that all the proceedings from the preparation of the papers to the consummation of the loan in the usual course—including the note, deed of trust and quit-claim deed—were all arranged by Webster, the secretary of the plaintiff association. The defendant however testified that before signing the note and deed of trust to secure the loan he had read them and knew their contents and he was thereby informed of the following provisions in the note: ''And, as collateral security herefor, do hereby transfer and pledge Fifteen shares of stock numbered 4355, 6, 7, 8, 9, 60, 1, 2, 3, 4, 5, 6, 7, 8, 9, of the 14th series in said association, on which said sum of Three Thousand Dollars has been advanced and loaned, and promise also to pay said association our monthly dues of One Dollar per month on each of said shares of stock so transferred and pledged, together with all fines chargeable upon arrears of any such payments, according to the constitution and by-laws of said association; all above mentioned payments to be made on the first Wednesday of each month, and so continue, unless this loan be otherwise sooner cancelled and discharged, until said shares reach the ultimate value thereof, when the same may be cancelled by said association and applied to the payment hereof.''

The officers and directors of building and loan associations possess such powers as are granted by statute, charter and by-laws, and such as are inconsistent therewith which are necessary to the discharge of their several offices, but any substantial departure therefrom is *ultra vires*. Each of the officer's acts, in a way, as agent for the society and has power to bind it within the scope of the apparent authority which he posseses. [6 Cyc. 139.] No citation of authorities is necessary to support these elementary principles.

The by-laws of the plaintiff association are in substantial conformity with the article of the statutes under which it was incorporated. The secretary's duties were those usually prescribed and performed by such officers, with the addition that he was directed to follow the instructions of the board of directors. The corporation is not shown by the evidence to have held out the secretary to the public as possessing any other powers to act for the association than those prescribed by the by-laws and such as are usually possessed and exercised by such officers. Its secretary at the time, Webster, was not acting or authorized to act as the sole representative of the association in the management of its affairs. However, it is to be noted in this connection that such secretary sustained a dual relation to the association in that he was both secretary and a member of the board of directors. The evidence of the defendants tends to show that the 20-acre tract of land was purchased of Matthews and wife for $2,700; that Webster, as plaintiff's secretary, executed two warrants to Barrett, one for $2,500 and the other for $500, making the amount of the proposed loan. These warrants were both indorsed by defendant Barrett and delivered to Webster. Webster retained the $500 warrant after it had been indorsed and executed his personal check for the sum of $200 to defendant Barrett who indorsed the same and turned it back to Webster. The $200 personal check and the $2,500

warrant were delivered to the bank in payment of the purchase price ($2700) of the twenty acres of land. The $500 warrant was retained by Webster and was afterwards negotiated by him. By this transaction, Webster obtained $300 which was not accounted for. The first quit-claim deed for the land (the one executed to Barrett) was not recorded as directed but was withheld from record. In the meantime, other quit-claim deeds had been made and delivered by Matthews and wife to Webster. In one of these in which the grantee's name was left blank, Farwell filled in his wife's name as grantee and had the deed recorded, although the evidence shows that Farwell never paid a single cent consideration for the land. After this transaction, the first quit-claim deed (the one originally made to Barrett) turned up and was recorded. Subsequently, when the land was offered for sale under the deed of trust made by the defendants to the association, Farwell appeared and gave notice to the bidders that if they purchased the land they would buy a law-suit as the land belonged to his wife.

The proper conclusions to be drawn from this evidence are apparent. The concerted action between Webster and Farwell, from the inception of the transaction to its close, as shown by the facts and circumstances, leave no question but that there existed a fraudulent combination between them, concealed from the directors of the association, by which they were to gather to themselves, clandestinely, by these transactions, forbidden fruit. By this secret maneuver, Webster received $300 of the money of the association, and, so far as the evidence shows, converted it to his own use. Farwell received, through Webster's complicity, title to the twenty-acre tract of land in his wife's name. There seems to be no evidence that Barrett was cognizant of the framing-up of these deals, but his close association with these persons during the several transactions, with his proved business ex-

perience, leaves a marvel how it was possible for a man of fair business sagacity not to have had some inkling of the fraudulent scheme that was being concocted between the other parties.

The respondents strenuously contend that as Webster sustained a dual relation to the association—both as secretary and director—and was present and acting in the meeting of the board of directors when the so-called loan was authorized and approved by the board, under such circumstances knowledge possessed by Webster in law should be imputed to the association. The evidence tends to show that at the meeting of the board of directors at which the application for the loan of Barrett was considered and approved, Webster was present; but the evidence further disclosed that none of the other directors had any knowledge that this loan was any different from the usual course of making loans and that the board of directors had no knowledge that it was a concealed attempt to purchase the land under the guise of a loan. At this meeting the evidence further shows that Webster did not in any way communicate to the board or any of its members the arrangement that he had made with the defendant Barrett for the purchase, as claimed by Barrett, of the twenty acres of land, but that he allowed the loan to be passed on and approved by the board in the ordinary course of such business. The respondents claim that under these facts, knowledge of Webster while sitting as a director in the board of directors as to the transactions between himself and Barrett should be imputed to the board of directors. The law seems to be that the existence in the breast of a single director while sitting in the board, of a matter of knowledge which he ought to communicate, and which he can properly communicate to his co-directors, is knowledge to the corporation as matter of law. [10 Cyc. 1057.] And it is also true that the principal is ordinarily chargeable with the knowledge

acquired by his agent in executing the agency. But there is a well-recognized exception to this rule of imputed knowledge. When the officer is acting for himself and adverse to the corporation, especially when committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act, the notice of such facts by a single director, even when officially engaged in the place of business of the corporation is not notice to the corporation. [Thompson on Corporations (2 Ed.), 1688; 10 Cyc. 1057; Brookhouse v. Union Pub. Co., 62 Atl. 219, 2 L. R. A. (N. S.) 993, and notes.] These authorities recognize the ancient declaration that a servant cannot at the same time serve two masters whose interests are antagonistic.

The respondents in this case further claim that the act of the plaintiff's secretary in the purchase of the Matthews land under the forms and in the manner set up in the evidence was one merely in excess of its powers and not prohibited by law, and the contract having been fully performed, the defense of *ultra vires* cannot be legally entertained by the court. This contention is grounded upon the assumption that building and loan associations under the law under which the plaintiff was organized are authorized to become purchasers of real estate. Turning to the by-laws of the plaintiff association, we find in section 14 of article 3 the following provisions authorizing the purchase under certain conditions of real estate for the purpose of investment: . . . if at any time the funds accumulate in the treasury in excess of the demands of borrowing shareholders, the directors may invest the same in real estate for the benefit of the association or they may loan to persons not members of the association in the manner hereinbefore provided.'' It will be noticed that in these by-laws the sole authority to invest the surplus funds of the association in real estate is reserved to the directors of

the association; and as the evidence in this case fails to show that the directors ever gave any authority to its secretary to make any investments on real estate, this by-law gives no support to respondents' contention. Our statute concerning building and loan associations, article 8, chapter 33, Revised Statutes 1909, does not seem to invest the association with such general authority to dispose of its accumulated funds as provided in this by-law. Section 3388, Revised Statutes 1909, defining the scope of its powers, enacts: "The object of such corporation shall be the accumulation of a capital in money, to be derived from payments by its members in periodical installments or otherwise, at such time and in such manner as shall be provided in the by-laws, and from the profits and accumulation arising from the investment of such payments." From this and other sections of the law the general purpose is made manifest that it was mainly to enable its members to accumulate funds by payment of dues to the association and to enable them to secure loans of such funds by competitive bidding and thereby enable them to procure homes for themselves to be paid for in monthly installments to the association. The only power given to the association to purchase real estate is to be found in section 3394, Revised Statutes 1909, as follows: "Any corporation created by or under this article is hereby authorized and empowered to purchase at any sheriff's or other judicial sale, or at any other sale, public or private, any real estate upon which such corporation may have or hold any mortgage, deed of trust, judgment, lien or other encumbrance, or in which such corporation may have an interest; and the real estate so purchased to sell, convey, lease or mortgage, at pleasure, to any person or persons whatsoever." The absolute necessity of this provision, where an institution is engaged in loaning its funds on real estate security,

to enable the loan association to protect their loan secured by deed of trust is very apparent. We think that by a consideration of the whole scope of powers granted to building and loan associations by this statute it must be concluded that the Legislature intended to deny to such associations the right to enter the real estate market and become real estate brokers and speculators and to hazard the accumulation of the funds of its members in real estate deals. The rule of statutory construction would apply—*"Expressio unius est exclusio alterius"*—and a proper interpretation of the statute prohibits, by implication at least, building and loan associations from making purchases in a general way of real estate; and, of course, the purchase of the twenty-acre tract of land under the theory upon which the defendants' defense was constructed in this case would be equally prohibited by the statute, although indirectly made. It being apparent that the Legislature intended to prohibit the purchase of real estate except in the manner heretofore specified, any attempt by the association to convey real estae under these circumstances would be a nullity and its legal disability would be such as to deprive any such act on its part or any contract so made of any legal existence, and consequently the same could not be made the foundation of any right of action or ground of defense to any action by either party. In this case, however, the association did not set up its unauthorized act in attempting to secure the services of the defendant Barrett in making the purchase of this land, but claimed that any such attempt was made without its knowledge and was the unauthorized act of its secretary to secure his own private ends.

It follows from what has been said that the judgment was for the wrong party and that the case was tried upon the wrong theory. It is therefore ordered that the judgment be reversed and the cause remanded

with directions to the trial court to enter judgment for the plaintiff for the balance due, principal and interest, on the note, unless the defendants shall desire a jury to determine such amount.  All concur.