THOMAS FORNATARO, PLAINTIFF, v. THE ATLANTIC COAST BUILDING AND LOAN ASSOCIATION, DEFENDANT.

LOUIS ROMANO, PLAINTIFF, v. ATLANTIC COAST BUILDING AND LOAN ASSOCIATION, DEFENDANT.

Decided November 28, 1932.

For the motion, *Endicott & Endicott* (*John Warren,* on the brief).

*Contra, Bolte & Tripician.*

Sooy, C. C. J. These cases are before me on motions to strike the complaints on the ground that they do not set forth a cause of action under chapter 102. *Pamph. L.* 1932.

The facts set forth in the complaints are that (a) defendant is a building and loan association under the laws of New Jersey; (b) that on December 31st, 1925, plaintiff Romano became a member and that on June 7th, 1923, plaintiff Fornataro became a member; (c) that thereafter both plaintiffs made various deposits as such members; (d) that thereafter defendant association credited declared dividends in favor of plaintiffs; (e) that both plaintiffs, on January 4th, 1932, gave to defendant notice of withdrawal; (f) that defendant made various payments on account of the withdrawal value of plaintiffs' shares; that on July 5th, 1932 (more than six months after notice of withdrawal had been served) plaintiffs made written demand on defendant for the balance then unpaid, which demand was refused by defendant.

It will be observed that both plaintiffs became members of defendant association prior to the Building Loan act as amended in 1932 and during the time that building loan associations were regulated by the act of 1925.

It will also be noticed that the withdrawal notices were given prior to the time when the amendment of 1932 became effective but that the six-month period did not expire until after the abendment had gone into effect, the effective date of the amendment being April of 1932.

Plaintiffs contend that their rights and defendant's obligations are controlled by the act of 1925 while defendant contends that the amendment of 1932 controls.

*Pamph. L.* 1925, *ch.* 65, ¶ 52, *p.* 212, provides as follows:
"Payment of Withdrawals.

Withdrawals from any such association shall be paid in the order in which the notices thereof shall have been received, but no more than one-half the receipts of any one month shall be required to be used for the payment of withdrawal claims, without the consent of the board of directors, until the oldest of such claims then unpaid shall have been on file for a period of six months; but in no case shall pay-

ment be postponed for a period longer than six months from the date of such notice, and any member who has given the said notice may sue for and recover the withdrawal value of his shares in any such association in any court of competent jurisdiction, if the same is not paid within six months from the date of giving of said notice of withdrawal."

This provision of the statute remained unchanged until 1932 when the legislature passed an amendment thereof which amendment constitutes chapter 102 (*Pamph. L.* 1932), and reads as follows:

"Withdrawals from any such association shall be paid in the order in which the notices thereof shall have been received, but not more than one-half of the total receipts of any such association in any month, as income on investments authorized by section 26 hereof, dues on shares pledged with such association to secure loans authorized by paragraph 2 and 5 of section 26 hereof and repayment of loans authorized by paragraph 2 and 5 of section 26 hereof shall be required to be used for the payment of withdrawals without the consent of the board of directors; provided, however, that if, in any one month the funds of the association required to be available for any such purpose by its board of directors, are at any time insufficient for the payment of all withdrawals which have been requested, then the right of any withdrawing member to priority of payment of the withdrawal value of his shares in the aforesaid order, shall be only to the extent of $500 in any one month and there is then a balance of such funds available for the payment of withdrawals then said order of priority of payment, to the extent of $500 shall continue to apply until such balance is exhausted; and no withdrawals shall be paid if the funds available for the payment of matured shares are insufficient to pay all matured shares, the payment of which has been requested within thirty days after maturity; and members who have thus requested payment of their matured shares shall have a right to such payment prior to the rights of members who have requested payment of the withdrawal value of their shares. A member who has filed a notice or request for withdrawal shall not have the

right to sue any such association to recover the withdrawal value of his shares or such part thereof as may not be paid, so long as the funds in the treasury of such association are applied as required herein."

An analysis of these statutory provisions discloses the following changes made by the amendment:

Prior to the amendment it was provided that withdrawals should be paid in the order in which the notices therefor were received—the amendment makes the same provision as to priority but limits priority rights to payment out of funds allocated by the statute for that purpose.

Prior to the amendment, not more than one-half the receipts in any one month could be required to be used for payment of withdrawals without the consent of the board of directors until the oldest had been on file for six months, and thereafter all receipts were required to be used. Under the amendment the funds required to be used for the payment of withdrawals are limited to one-half of the receipts in any month on income on investments authorized by section 26 of the act, plus dues on shares pledged to secure loans, authorized by paragraphs 2 and 5 of said section, plus payment of loans authorized by said paragraph and section. The right of the board of directors to use receipts in excess of those required to be used for the payment of withdrawals still continues.

Prior to the amendment, section 52 made no reference to matured shares, while the amendment provides that withdrawals shall not be paid if the funds available for the payment of matured shares are insufficient to pay all matured shares, the payment of which have been requested within prescribed times.

The act prior to the amendment gave a right of action to a withdrawing member whose withdrawal was not paid within six months while the amendment prohibits a suit so long as the funds in the treasury of the association are applied as required by the statute.

Plaintiffs contend that under the act of 1925, they had certain vested rights as withdrawing members and that those

rights may not be taken away by a retrospective construction of the 1932 amendment.

The first question presenting itself for solution is as to the status of plaintiffs as of January 4th, 1932, i. e., the status of a member having given a notice of withdrawal.

A careful research of the decisions on this point reveals quite a contrariety of judicial opinion.

The earlier decisions seem to have quite generally followed the ruling of the Pennsylvania courts in the case of *United States Building and Loan* v. *Silverman*, 85 Pa. St. 394, decided in 1877, which held that the status of a withdrawing member is changed from that of a member to that of a general creditor and it is this doctrine which plaintiffs contend for.

The second rule is that adopted by the Minnesota courts in *Heinbokel* v. *National S. L. and B. L. Association*, 58 Minn. 340; 25 L. R. A. 215, decided in 1894, which is that a withdrawing member, whose withdrawal notice has matured, does not have a right of action until the association has in its treasury funds available for the purpose of paying his withdrawal. In later cases this rule has been modified so that the so-called second rule may be said to be that set forth in *Synott* v. *Iron Belt Building and Loan Association*, 89 Fed. Rep. 292, i. e., that upon the maturity of the withdrawal notice the status of a member becomes that of a creditor, the amount of the debt fixed but that the debt is not payable until there are funds in the treasury to pay it after the payment of prior withdrawals in the order of their filing; in other words, the status of the withdrawing member is that of a *quasi*-creditor but not such a status as to give him a preference over the other and remaining members of the association upon distribution of the assets.

The following cases are in line with this second rule: *Pawlick* v. *Homestead Loan Association*, 37 N. Y. Supp. 164; *Eastern Building Loan* v. *Snyder*, 37 S. E. Rep. 298; *Miers* v. *Columbia Building Loan*, 157 Fed. Rep. 940; *Engelhardt* v. *Fifth Ward Permanent Dime Savings and Loan Association*, 148 N. Y. 281; 35 L. R. A. 289, and many other cases cited in defendant's brief.

The third rule and the one for which defendant contends, is that upon the maturity of the withdrawal notice, membership continues and that no creditor rights are then attained by the withdrawing member unless and until the association has breached the membership contract by failing to pay withdrawals according to the statute. I will discuss this so-called third rule hereinafter.

The first rule (*United States Building Loan* v. *Silverman, supra*) has been repudiated by the courts of Pennsylvania in later cases in that state and is now stated to be the minority rule. 9 *C. J.,* § 39, ¶ 939.

The Pennsylvania courts, in the case of *Stone* v. *New Schiller Building Loan,* 153 *Atl. Rep.* 748, decided January 5th, 1931, distinctly repudiates the basic case of *United States Building Loan* v. *Silverman, supra,* and I am convinced that it is not the rule to be followed herein even though it may be said that there are cases in New Jersey which may be construed to be in accord therewith. These cases were not dealing with any legislative act in any way similar to the amended act as contained in *Pamph. L.* 1932, *ch.* 102.

The second rule, that a withdrawing member has a *quasi*-creditor status, it would seem to me, would be the true rule, if I had before me for consideration the act of 1925 alone, but that is not the situation. I also have the amendment of 1932 and if plaintiffs' rights are to be determined by the provisions of the amendment, it seems to me, that the legislature has, by the very terms of the amendment, fixed the rule which must be followed by the courts of this state and that rule is that plaintiffs, as withdrawing members, have no creditor status until the defendant association has breached its contract of membership and the incidental statutory right of withdrawal, *i. e.,* as long as it applies the funds to the payment of withdrawals as is provided by the statute.

However this may be, it is certain that in this day the courts of this state will not follow the first rule, *i. e.,* that upon maturity of the withdrawal notice, such a creditor status is attained as to prevent mutuality and equal participation in profits and losses to result.

In the very recent case of *Richman* v. *Hercules Building and Loan Association* (*Docket* 58, *p.* 132), Mr. Chief Justice Gummere repudiated any such rule and he did so in face of the contention that the case of *Intisio* v. *Metropolitan Savings and Loan Association,* 68 *N. J. L.* 588; 53 *Atl. Rep.* 206, decided in 1902, held to the contrary.

What happened in the Hercules case? Plaintiff had a matured notice and brought suit, defendant, a building and loan association, answered; a motion to strike the answer was made and the chief justice allowed the seventh defense to stand. That defense was, in part, as follows:

1. "The defendant association" is a corporation under 'An act concerning building and loan associations' (*Pamph. L.* 1903, *p.* 457), and at all times until 1925, was subject to said act and its amendments and supplements and since March 12th, 1925, has been subject to the act as contained in the Revision of 1925.

2. That "the defendant association is a mutual and co-operative association, all the members of which are equally entitled to participate and share in its assets, in the proportion that each member contributes to the common capital thereof.

3. Plaintiff "has been and still is a member thereof.

4. "Payment of the alleged withdrawal value of the plaintiff's shares as claimed in this suit, would materially reduce the value of the shares of the remaining, continuing and withdrawing members of the defendant association, would give to the plaintiff more than her proportionate share of the assets of the defendant association, would prevent the remaining members of defendant association from equally participating with plaintiff in the distribution of the assets, would give to plaintiff an undue and illegal preference over the members remaining in the association, would deprive said remaining members of their property without due process of law, and would result in an illegal distribution of the assets of defendant association."

Surely, this ruling by the chief justice is a repudiation of an absolute creditor standing and with nothing before the

court, other than the act of 1925, seems to me to be authority for the second rule.

But it is quite apparent that, under the second rule, these motions to strike could not prevail if the act of 1925 controls and not the amendment of 1932, because the right to suit is given by the act of 1925 and the result would be that the defendant would be compelled to answer and set up in its answer the "seventh defense."

The result is that the discussion as to the three so-called rules is academic if the 1932 amendment controls other than that even under the act of 1925, plaintiffs come under the second rule.

The amendment of 1932 clearly deprives plaintiffs of a right to sue until the defendant has failed to apply its funds in the payment of withdrawals as therein provided and if that statutory enactment be viewed from an intention to legislate retrospectively, these complaints should be stricken.

Plaintiffs contend that to so construe the amendment would violate their rights under article 4, section 7, paragraph 3, of the constitution of this state and also article 1, section 10, of the constitution of the United States.

What were plaintiffs' contractual rights?

Any right of withdrawal they had was merely a privilege granted to them by the legislature and such a privilege was in fact granted.

"2. It has, I think, been uniformly held that the right of withdrawal does not exist except as conferred by a by-law or a statute." *Fitzgerald* v. *State Mutual Building and Loan Association,* 76 *N. J. Eq.* 137; 79 *Atl. Rep.* 454.

That plaintiffs' privilege of withdrawal was conferred by statute is apparent.

The first Building and Loan acts were *Pamph. L.* 1847, *p.* 172, and *Pamph. L.* 1849, *p.* 227, and no attempt was made therein to regulate withdrawal privileges and obligations. In 1899, by *Pamph. L.* 1899, *p.* 557, the privilege was granted but nothing done with reference to the method of payment of withdrawals. In other words, the legislature left the parties to their own contracts as to the method, time, &c., of

payment. It was under this later act (1899) that the case of *Intisio* v. *Metropolitan Savings and Loan, supra,* was decided and it was then held that the contract relations arising from membership in associations organized under that statute could not be constitutionally altered by viewing a subsequent statute in retrospect—but the provisions as to payment, &c., of withdrawals were those in the by-laws of the association and not those fixed by any statute. Thereafter, the legislature, by act of 1903, provided the method, time of payment, &c., and while that statute did not effect prior contracts arising out of by-law provisions, the legislature did take unto itself, for the first time, the matter of the regulation of withdrawals—not only as to the privilege of withdrawal but the manner in which payments should be made, &c. It is true that it left to the courts control of mutuality by "control of executions," but it took over that which it had theretofore left to the constitution and by-laws of the associations to regulate, *i. e.*, the manner of payment. From that time on, every purchaser of shares in a building loan association was given notice that he had a right of withdrawal and that the legislature had fixed the manner of payment and that while building and loan associations could make the same provisions by its by-laws, there was no power so to do if the provisions of the by-laws limited or attempted to transcend those of the legislative acts.

The result was that when plaintiffs became shareholders they knew that the legislature had legislated as to withdrawals and that it had reserved the right and power to further legislate and that their rights with respect to withdrawals were derived from statute and not by way of contract arising out of by-law regulations.

Reserved power of the legislature.

Article 4, section 7, paragraph 2, of the constitution of New Jersey, provides: "The legislature shall * * * pass general laws under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration at the will of the legislature."

Building and loan associations are, by virtue of section 4

of the Building and Loan act, governed by the provisions of the General Corporation act, and such acts as may be enacted in the future as amendatory thereof or supplemental thereto, except as they may be inconsistent with the Building Loan act. Section 4 of the General Corporation act (2 *Comp. Stat., p.* 1600), provides:

"The charter of every corporation, or any supplement thereto or amendment thereof, shall be subject to alteration, suspension and repeal, in the discretion of the legislature, and the legislature may at pleasure dissolve any corporation."

Section 5 of said act (2 *Comp. Stat., p.* 1601), provides: "This act may be amended or repealed, at the pleasure of the legislature, and every corporation incorporated under this act shall be bound by such amendments; but such amendment or repeal shall not take away or impair any remedy against any such corporation or its officers for any liability which shall have been previously incurred; this act and all amendments thereof shall be a part of the charter of every corporation heretofore or hereafter informed hereunder, except so far as the same are inapplicable or inoperative to the objects of such corporations."

This reservation of power is called the police power of the state and can only be used for the benefit of the public and be exercsed by the state. *Zabriskie* v. *Hackensack, &c.,* 18 *N. J. Eq.* 178, 192.

Surely, it may not be said that under this reservation of power, the legislature was confined to legislation which would only effect those who became shareholders after the act went into effect.

When the amendment of 1932 went into effect the membership of defendant association consisted of shareholders who had been such for from one month to over eleven years and could anything be more clear than that the legislature had the right to regulate withdrawals both as to these members and those yet to become members and that the same law should apply to all?

It would be impossible to conceive of a bookkeeping set-up capable of handling such a situation as would be created if plaintiff's contention were to control.

It seems to me that the legislative intent is apparent and no vested right of plaintiffs are violated by giving to the 1932 amendment a retrospective construction. It also seems quite apparent that all the legislature ever guaranteed to plaintiffs as shareholders was that they should have the right of withdrawal and that they should, on withdrawal, be paid sums that were certain and not that they should be paid at a certain fixed time irrespective of any change on conditions that might occur in the financial world between the time of their initial membership and the time of their attempt to withdraw.

The legislature, in 1925, gave the shareholder a right to bring suit on a withdrawal notice at the expiration of six months after notice given and left it to the courts to control the execution and plaintiffs knew that, if in the judgment of the legislature the time within which suit could be brought should be changed, that there was reserved in the legislature the power to make the change.

They, plaintiffs, also knew that the purpose of all legislation would be to conserve the mutual interest of all shareholders, the old and the new, and that all legislation, therefore, would, as to some shareholders be from the retrospective aspect.

What the legislature did by the amendment of 1932, it seems to me, was to bolster up the ultimate result, *i. e.,* assured, more nearly, that there would be an ultimate payment of withdrawals without jeopardizing the very life of the association and thereby secured to the member the payment of his withdrawal in such manner that the payment thereof might not destroy mutuality and equal participation in assets and losses.

The reservation in the legislature to repeal and alter existing statutes (the police power) has received the sanction of the courts even when it affected vested rights.

In *Union Dry Goods Co.* v. *Public Service Corp.,* 248 *U. S.* 372, Mr. Justice Clark said:

"It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not pre-

vent the state from properly exercising such powers—for the general good of the public, though contracts previously entered into between individuals may thereby be affected," and after citing opinions, he further said:

"These decisions, few from many, to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the state."

The court will take judicial notice of the stress of the financial situation existing at the time the amendment of 1932 was acted upon and with that crisis in the financial world and nation in view, there can be no doubt that in the exercise of its reserved power, the legislature was acting for the welfare of all investors in building and loan. Many of our financial institutions had closed their doors, a panic stricken people had created runs on banks and these institutions had not been able to continue in business, not because, in many instances, they did not have sufficient assets to pay, but because their assets were frozen. Fortunately, building and loan associations had, in the main, weathered the storm, but, even a limited knoweldge of the character of their investments, the great number of foreclosures and consequent taking over of real estate, makes it apparent that they could not meet all the demands of this panicky public, if they were to be compelled to continue under the act of 1925, so that, in the enactment of the 1932 amendment, the legislature came well within the rule as laid down by Mr. Justice Holmes in *Noble State Bank* v. *Haskell*, 219 *U. S.* 104, wherein he said that "police power extends to all great public needs."

I have been favored with a wealth of authority sustaining the validity of the amendment of 1932 viewed from its retrospective aspect and it seems to me to be so overwhelming as to permit of no other result on these motions, than that the complaints should be stricken and plaintiffs be thereby obliged to refrain from suit until such time as the defendant association fails to apply its funds in the payment of plaintiff's withdrawal notices as provided by the amendment of 1932. Such will be the order.