This is a bill originally filed by Mr. Moore as conservator of the Atlantic City Loan and Building Association, hereinafter referred to as the Association, which Association has since been taken over by the commissioner of banking and insurance, hereinafter referred to as the commissioner, that official having been substituted as complainant.
Prior to the filing of the bill of complaint, suits at law had been instituted against the Association by holders of certain certificates issued by it to recover the amounts alleged to be due the several holders thereof and many more such suits were contemplated, so that, there being some seven hundred and upwards of these certificates, having a face value of $800,000, it became apparent that the rights and liabilities of these certificate holders should be determined by this court, with the result that the commissioner filed his bill of complaint in the nature of aquia timet. *Page 63 
Representatives of all parties in interest have been brought into court through service on at least ten per cent. in number and amount of each class of defendants and each class so brought into court has filed answers, so that all the issues that should be determined have been raised by the pleadings and these pleadings do not question the jurisdiction of this court to completely dispose of the rights and liabilities of the Association and the defendants.
The answers filed represent the following classes of claims against the Association: (a) those owners of certificates who took them instead of cash for the running shares of stock which these owners had in the Association which had matured; (b) those owners of certificates who are not owners of running shares, but purchased the certificates in the open market; (c) those owners of certificates who purchased them from the Association and paid for them with the proceeds received from the Association for its running shares which had matured just immediately before the transaction was consummated; (d) those who held running shares not yet matured and upon which a mortgage loan had been obtained from the Association; (e) those who held running shares not yet matured; (f) those who had claims against the Association arising independently of stock or certificates, i.e., common creditors, and (g) the commissioner of banking and insurance.
The certificates heretofore referred to which gave rise to the necessity of the present litigation are in the following form:
Type No. 1:
"No. _________ _________ Series
 ATLANTIC CITY LOAN
 AND BUILDING ASSOCIATION
 OF ATLANTIC CITY, NEW JERSEY
___________ Shares $ ___________
THIS IS TO CERTIFY, that the ATLANTIC CITY LOAN AND BUILDING
ASSOCIATION of Atlantic City, New Jersey, is indebted to ____
and ____ assigns in the sum of ____ dollars, being the full
value of Two Hundred Dollars per Share upon ____ Shares of the
Stock of the said Association as appears by Certificate
 *Page 64 
of Stock No. ____ with interest thereon at the rate of ____ per
cent per annum until paid in accordance with the following
provisions of the Constitution of the said Association:
 "SECTION 8 — When the value of any series of shares
 shall be two hundred dollars a share, the stockholders
 holding free shares shall receive the full value of their
 shares, either in cash or bonds bearing interest not to
 exceed 5 per cent."
 This Certificate is transferable on the books of the
 Association in person or by power of Attorney.
 IN WITNESS WHEREOF, the President and Secretary have hereunto
 attached their signatures and caused the seal of the said
 Association to be affixed at Atlantic City, N.J., this
 ____ day of ____ 19__.
 ___________ Secretary ___________ President."

Type No. 2:
"No. _________ _________ Series
 ATLANTIC CITY LOAN
 AND BUILDING ASSOCIATION
 OF ATLANTIC CITY, NEW JERSEY
___________ Shares $ ___________
THIS IS TO CERTIFY, that the ATLANTIC CITY LOAN AND BUILDING
ASSOCIATION of Atlantic City, New Jersey, is indebted to ____
and ____ assigns in the sum of ____ dollars, being the full value
of Two Hundred Dollars per Share upon ____ shares of the stock in
the ____ series of stock of the Association as appears by
Certificate of Stock No. ____, with interest thereon at the rate
of ____ per cent. per annum from the date hereof until paid. If
this Certificate is outstanding for more than six months the said
interest shall be paid semi-annually. The indebtedness
represented by this obligation shall become due upon ninety days'
written notice to the Association but the Association shall have
the right, at any time, to pay the principal of this obligation,
together with interest to date of such payment.
 This Certificate is transferable on the books of the
 Association in person or by power of Attorney.
 IN WITNESS WHEREOF, the President and Secretary have hereunto
 attached their signatures and caused the seal of the said
 Association to be affixed at Atlantic City, N.J., this
 ____ day of ____ 19__.
 _________________ ___________________
 Secretary President."
 *Page 65 
Type No. 3:
"No. _________ _________ Series
 ATLANTIC CITY LOAN
 AND BUILDING ASSOCIATION
 OF ATLANTIC CITY, NEW JERSEY
Shares $
THIS IS TO CERTIFY, that the ATLANTIC CITY LOAN AND BUILDING
ASSOCIATION of Atlantic City, New Jersey, is indebted to ____
and ____ assigns in the sum of ____ dollars, being the full value
of Two Hundred Dollars per Share upon ____ Shares of Stock of the
said Association, as appears by Certificate of Stock No. ____
with interest thereon, at the rate of ____ per cent. per annum
until paid in accordance with the following provisions of the
Constitution of the said Association:
 AMENDMENT III When the value of any Series shall be two
 hundred dollars a Share, the stockholders shall receive the
 full amount of the value of their shares:
 Provided, That at no time shall more than one-half of the
 funds in the treasury be applied to withdrawing stockholders.
 The preference of withdrawing shall be given to the highest
 bidder; the member so bidding being entitled to the value of
 one or all of his shares at the same rate of premium.
 This Certificate is transferable on the books of the
 Association in person or by power of Attorney.
 IN WITNESS WHEREOF, the President and Secretary have hereunto
 attached their signatures and caused the seal of the said
 Association to be affixed at Atlantic City, N.J., this
 ____ day of ____ 18__.
 ___________ Secretary ___________ President."

A blank form of assignment appears on each type of certificate in the following form:
"FOR VALUE RECEIVED, ____ hereby assign, transfer and set over the within Certificate of Paid-up Stock of the ____ Series of the ATLANTIC CITY LOAN AND BUILDING ASSOCIATION, and all benefits and advantages to be derived therefrom, unto and to the use of ____."
It must be kept in mind that the first type of certificate, marked No. 1, was issued by the Association between March 15th, 1913, and March 22d 1932, and that the second type, marked No. 2, was issued between March 22d 1932, and November 30th, 1935, and that certificates of the third type. *Page 66 
marked No. 3, were issued between September 7th, 1877, and March 16th, 1912, and that none of this latter type of certificate is outstanding, but have all been paid off and were paid off prior to the time when the Association was taken over by the commissioner.
The Association was incorporated under an act entitled "An act to encourage the establishment of mutual loan and building associations," approved February 28th, 1849 (Nixon's Digest 92;P.L. 1849 p. 227), the actual date of incorporation having been January 29th, 1869.
Under the act of 1849 aforesaid, the Association was given all the powers enumerated in section 1 of the Corporation act. P.L.1846 p. 16; Nixon's Digest 167.
Section 6 of the Building and Loan act aforesaid provides that "all matters not herein provided for shall be regulated by the constitution and by-laws."
In pursuance of the authority above quoted, the Association, in 1869, adopted a constitution and by-laws and provided, interalia, article 2, section 8:
"When the value of any series of shares shall be two hundred dollars a share, the stockholders holding free shares shall receive the full value of their shares, either in cash or bonds bearing interest not to exceed 5 per cent."
Under the authority of the above quoted section, the present certificate holders now insist that this court must determine that said certificates are bonds and that they constitute a debtor and creditor relation between the holders thereof and the Association, thus entitling said holders to be paid the value thereof before the payment of anything on account of the amount due or to grow due on the running shares of the Association.
If the contention of the certificate holders, as above outlined, is sustained, a debtor and creditor relationship will be established in a sum approximating $800,000. The total assets of the Association, as of December 31st, 1935, were listed as $2,143,791.65; the installment shares, dues accrued, were *Page 67 
$617,509.58; the actual borrowed money was $103,935.36, so that the percentage of installment shares to the total assets was 28.80, the percentage of the matured certificates to the total assets was 38.82 and the percentage of the borrowed money to the total assets was 4.85.
The contention of those with interests opposed to the holders of the certificates is that the certificate holders do not hold bonds or certificates of indebtedness, but that they are the holders of certificates of full-paid stock or income shares and that they have no preferential rights over and above the other members of the Association, but must share in the assets of the Association pro rata with other members thereof, and that, conceding only for the purpose of argument that the Association did have a right under its original charter to issue bonds, that that right was taken away by subsequent legislation.
The nature of the transaction between the Association and those to whom the questioned certificates were issued is controlling in arriving at the true contract created between the parties, rather than the form of the certificate. See Bettle v. RepublicSavings and Loan Association, 71 N.J. Eq. 613, in which case the certificates were called "income stock," but the court held that the holders were not stockholders but creditors for money loaned. See, also, Intermountain Building and Loan Association v.Gallegos, 78 Fed. Rep. 2d 972.
The books of the Association show that when the various series of stock matured the full amount of the matured series was entered in the cash book and, in the earlier days of the Association, a credit was given for each individual shareholder, but that later the total of the maturities was entered as a single item, and on the debit side of the cash book the amount of the certificate was entered under the name of each holder for the amount of the maturity paid by the certificate issued to the stockholder. At all times during the life of the Association, according to its bookkeeping and other records, every maturing series was recorded as fully paid, and so the stockholders were kept advised, and so they were reported to the department of banking and insurance. *Page 68 
The form of the certificate is couched in such language that it may well be called a certificate of indebtedness and was originally issued, no doubt, as a "bond" in pursuance of section 8 of the constitution of the Association, and it may well be that the Association, under its charter, had authority to issue such "bonds" in payment of maturities, but in arriving at the nature of the transaction between the parties and the contract which they entered into when the now outstanding certificates were issued, we are not presently dealing with the charter rights of the Association as they existed prior to 1903, for the reason that none of the outstanding certificates was issued prior to 1915. We will have occasion later herein to discuss the question as to whether the charter rights prior to 1903 were altered or amended by the Building and Loan act of 1903 and subsequent legislation.
In the first place, the evidence discloses that all outstanding certificates were originally issued to members of the Association, who received them in lieu of cash for the matured shares of the Association, and they were issued in pursuance of an invitation extended by the Association to holders of running shares which were about to mature, for which maturity the shareholders were told by letter (as to outstanding unpaid certificates) that they might accept "full-paid stock" in lieu of cash for their matured shares, but it is in evidence that the form of letter used prior to 1920 and at least from 1915 to the 1920's was in all things similar to that of which the following is a copy:
 "ATLANTIC CITY LOAN AND BUILDING ASSOCIATION 448 Guarantee Trust Building
JOHN C. SLAPE, Secretary Atlantic City, N.J. ____ 192_.
TO THE MEMBERS OF THE MATURING ( ) SERIES OF SHARES OF THE ATLANTIC CITY LOAN AND BUILDING ASSOCIATION:
The series of shares of this Association will mature on with the payment of the dues.
The Association will, as heretofore, issue certificates of paid-up stock for the maturing shares, bearing interest at the rate of 5% per annum, from the day of , 192 , payable semi-annually. *Page 69 
Stockholders desiring cash for their maturing shares may have the same by applying to the Secretary; if it be inconvenient or impossible for you to invest the money due on your maturing stock at this time, the certificates of paid-up stock may be recommended as a safe and desirable investment, particularly in view of the rate of interest they bear, and the fact that they will be paid upon one week's notice to the Secretary.
Kindly notify the Secretary at your earliest convenience whether cash is desired for your maturing shares or whether a certificate of paid-up stock will be accepted for the same.
 Very truly yours, Secretary."
So that the Association had agreed to give full-paid stock in lieu of cash to matured shareholders, and the owner thereof had accepted delivery of that which the Association agreed to give, to wit, full-paid stock.
In addition to this, the shareholders had delegated as their agents other shareholders as directors, and these directors had, from January 27th, 1915, and the succeeding years, by resolution, directed payment of maturities in certificates of "full-paid stock" or certificates of "matured stock."
As to agency, see Home Building and Loan Association v.Barrett, 160 Mo. App. 164; 141 S.W. Rep. 723.
From 1915 to 1924, inclusive, the motion was "in cash or certificates of paid-up stock" and from 1924 to 1928, inclusive, it was "in cash or certificates of matured stock" while from 1929 to 1930 there was no motion for maturities.
From this it is seen that all certificates now outstanding were issued, in so far as the minutes disclose, under the denomination of either "certificates of paid-up stock" or "matured stock." It should also be noted that during all of these years the form of the certificate was either type 1 or type 2.
It must be kept in mind that the certificates were not issued by an Association unable to pay its maturities as they were declared. The fact is that the Association was at all times able to pay its maturities by the use of cash accumulated for that purpose, or by part cash and the exercise of its borrowing power within the statutory limit. *Page 70 
The books of the Association show that there never were maturities that remained unpaid, either in cash or by the acceptance of the certificates by the matured shareholders. The reports of the Association to its stockholders and to the department of banking and insurance discloses no unpaid maturities, so that it would seem that the certificates were not given as an evidence of an unpaid maturity, i.e., that the Association did not so consider them, and the holders of the certificates had no right to so consider them from the standpoint of the transaction under which they were delivered. At the time of their delivery the stockholders took them, or were advised that they could elect to take them as an "investment" bearing a certain rate of interest, or they could take cash. In either event, the maturity was satisfied and they had either cash or an investment in lieu thereof. By electing to take the investment they ceased to be creditors or quasi-creditors by reason of their maturities, but remained the holders of something in lieu thereof, to wit, the certificates. The statute gave the Association the right to issue full-paid stock (P.L. 1903 p.457), and if the Association did not have authority to issue bonds or certificates of indebtedness for the payment of maturities, the matured shareholders will be deemed to have sought for that which the statute authorized and the Association will be deemed to have attempted a legal contract and not one that was illegal, and we hold, in this connection, as will be observed hereinafter, that the Association, from 1903 on, was not empowered to issue bonds or certificates of indebtedness, so that on the question of the substance of the contract as entered into between the parties, we conclude that the form thereof does not control, but that in view of the transaction between the parties and the existent law at the time of the issuance of the certificates, that they represented "full-paid" or "income" stock and carried with them no preferential rights overrunning shareholders.
It may well be, as argued by the certificate holders, that the conduct of the Association in its issuance and dealings with the certificates in question, was such as to raise a question *Page 71 
as to whether, as to certificate holders prior to 1914, the Association was not estopped from asserting that the certificates created any other relation than debtor and creditor, but this question is not before me for decision. The question is, does the evidence disclose that the Association so dealt with these certificates after 1914 as to estop it from asserting that they are full-paid, matured or income shares, and thus give no preferential rights to the holders thereof, and my finding of fact is that the evidence does not justify such a defense but, on the contrary, there was nothing in the conduct of the Association or in its dealings with the certificates that justified a certificate holder in considering them other than full-paid shares, in so far as the issuance thereof by the Association is concerned. The form could have and probably should have been changed after the act of 1903 but the recipient of the certificate elected to take it instead of cash for his matured shares and he was advised by letter that what he was to get was full-paid shares in full payment of the maturity. The board of directors so denominated the certificates in their resolutions after 1914 and so reported them, not only to the state department but also in their statement to the stockholders.
The law authorized the issuance of full-paid shares and did not authorize bonds. The full-paid certificate, under the law, did not create a preference. It gave the holder an investment status but not a strangle hold on the assets of the Association, to the utter ruin of the running shareholder, and that the running shareholder would have been strangled were the certificates bonds, creating a debtor and creditor relation, is demonstrated by the following table, showing the relationship these certificates have borne to the assets of the Association, as compared with the investment of installment shareholders. *Page 72 

 ASSETS, INSTALLMENT MATURED SHARE CERTIFICATES
 ATLANTIC CITY LOAN BUILDING ASSOCIATION
 ATLANTIC CITY, N.J.
 JANUARY 1, 1913 TO DECEMBER 31, 1935
 Installment Certificates
 Year Shares For Actual
 Ended Total Dues Matured Borrowed
Dec. 31 Assets Accrued Shares Money
 1912 ............ 640,619.32 410,349.00 40,400.00 48,000.00
 1913 ............ 653,619.66 412,695.00 85,300.00 15,000.00
 1914 ............ 594,070.60 424,362.00 26,500.00 .........
 1915 ............ 595,383.97 425,874.00 25,800.00 .........
 1916 ............ 648,941.38 442,956.00 57,900.00 .........
 1917 ............ 697,256.60 474,813.00 58,900.00 10,000.00
 1918 ............ 742,720.66 508,497.00 68,800.00 5,000.00
 1919 ............ 790,092.14 518,589.00 75,300.00 25,000.00
 1920 ............ 954,450.63 547,932.00 156,050.00 70,000.00
 1921 ............ 1,179,268.24 583,260.00 210,550.00 160,000.00
 1922 ............ 1,250,937.71 622,560.00 285,050.00 100,000.00
 1923 ............ 1,323,273.61 680,211.00 373,450.00 40,000.00
 1924 ............ 1,513,175.32 773,190.00 458,600.00 25,000.00
 1925 ............ 1,642,429.40 822,192.00 537,700.00 .........
 1926 ............ 1,868,923.89 827,217.00 645,600.00 100,000.00
 1927 ............ 2,006,660.08 902,097.00 742,300.00 40,000.00
 1928 ............ 2,068,111.89 899,943.00 843,200.00 .........
 1929 ............ 2,080,873.89 898,539.00 857,250.00 .........
 1930 ............ 2,116,883.94 893,064.00 860,350.00 60,000.00
 1931 ............ 2,110,217.20 812,025.00 877,500.00 151,000.00
 1932 ............ 2,073,580.48 766,941.00 831,600.00 180,727.74
 1933 ............ 2,266,090.83 875,350.00 832,350.00 176,649.24
 1934 ............ 2,155,795.13 666,772.08 832,290.00 118,190.36
 1935 ............ 2,143,791.65 617,509.58 832,290.00 103,935.36
 Per Cent to
 Year Total Assets
 Ended Inst. Mat. Bor.
Dec. 31 Sh. Cert. Money
 1912 ............ 64.07 6.31 7.49
 1913 ............ 63.14 13.05 2.29
 1914 ............ 71.43 4.46 ...
 1915 ............ 71.53 4.33 ...
 1916 ............ 68.26 8.92 ...
 1917 ............ 68.10 8.45 1.43
 1918 ............ 68.46 9.26 .67
 1919 ............ 65.57 9.53 3.16
 1920 ............ 57.41 16.35 7.33
 1921 ............ 49.46 17.85 13.57
 1922 ............ 49.77 22.79 7.99
 1923 ............ 51.40 28.22 3.02
 1924 ............ 51.10 30.31 1.65
 1925 ............ 50.06 32.74 ...
 1926 ............ 44.26 34.54 5.35
 1927 ............ 44.96 36.99 1.99
 1928 ............ 43.52 40.77 ...
 1929 ............ 43.18 41.20 ...
 1930 ............ 42.19 40.64 2.83
 1931 ............ 38.48 41.58 7.16
 1932 ............ 36.99 40.10 8.72
 1933 ............ 38.63 36.73 7.80
 1934 ............ 30.93 38.61 5.48
 1935 ............ 28.80 38.82 4.85
 *Page 73 
The first question which presents itself after the foregoing discussion is, did the Association have power to issue certificates of indebtedness or bonds at any time since its organization and, if so, did that power so to do continue uninterruptedly until the Association was taken over by the commissioner, or, granting that it originally had the power, was it ever deprived thereof by constitutional statutory change in the fundamental law of such an Association?
The statute law under which certificates of type No. 3 were first issued was that of 1849, but as heretofore noted, not a single certificate issued thereunder is outstanding but, on the contrary, all certificates now unpaid upon which any of the defendants may base their claims have been issued since 1903, in which year the legislature enacted a revision of the Building and Loan law, and it is contended by the defendants other than the certificate holders that since 1903 the statute law under which the Association functioned was that of 1903, or the various amendments and supplements thereto which were enacted thereafter.
The defendants holding certificates under either forms 1 or 2 contend, however, that the Association, under the act of 1849, was given the power to issue bonds and under that authority the Association, by its constitution, provided for the issuance thereof and did actually issue bonds and that the constitution under which they were issued has never been changed by the Association and that the legislature, in 1849, having given the Association a charter and power to issue bonds, that that charter was a contract between the state and the Association and between the Association and its shareholders and bondholders, and that the legislature is powerless to change it, i.e., that subsequent legislation may not impair the obligation of the contract.
Section 7 of the General Corporation act aforesaid (Nixon'sDigest 168), re-enacted as section 4 of the General Corporation act of 1896 (P.L. 1896 p. 278; Comp. Stat. 1910 p. 1600), provides that the charter of every association shall be subject to alteration, suspension and repeal in the discretion of the legislature and all certificates now outstanding *Page 74 
were issued after the revision of 1903, and unless this attempted change by the legislature could not be constitutionally accomplished, we must look to the statute of 1903 and subsequent legislation for the power of the Association to issue bonds or certificates of indebtedness.
It is argued that the Association, having been incorporated in 1869 under the act of 1849, the constitution of New Jersey in effect at the time of the incorporation was that of 1844 and that article 4, section 7, paragraph 3 provided against the impairment of contracts and that it did not provide that the power granted to corporations should be subject to repeal or alteration at the will of the legislature, and that it was not until the constitution of 1875 that such a provision appeared in the constitution of this state, and that, ergo, the legislature was without power to alter and amend when the Association was incorporated and could never thereafter assume the right so to do without impairing the contract between the state and the Association.
The fact stands out that the legislature, in the act of 1849 incorporating building and loan associations, reserved the power to alter, amend, c. Did it have the power so to do? If so, the Association was at all times subservient to that power.
There can be no doubt but that a certificate of incorporation constitutes a contract between the state and the corporation (Trustees of Dartmouth College v. Woodward, 17 U.S. 518), nor is there any doubt but that it constitutes a contract between the stockholders and the corporation. Mayer v. Oxidation ProductsCo., Inc., 110 N.J. Eq. 141, 149; Einstein v. Raritan WoolenMills, 74 N.J. Eq. 624; Black v. Delaware and Raritan CanalCo., 24 N.J. Eq. 455. Nor can there be any doubt that it is also a contract between the stockholders inter sese. Mills v.Central Railroad Co., 41 N.J. Eq. 1; Loewenthal v. RubberReclaiming Co., 52 N.J. Eq. 440; Pronick v. SpiritsDistributing Co., 58 N.J. Eq. 97, and many other cases.
But as heretofore noted, the legislature reserved the right to repeal, alter or amend charters issued under the Corporation *Page 75 
act and the question is, did it have a right so to do and how far may a legislature go under that power?
First as to the contention that the legislature had no right to reserve power to alter or amend prior to the constitution of 1875.
Thompson on Corporations (3d ed.) 539 § 429, says:
"Where the right is reserved either by the constitution or bystatute the provision of the law to this effect becomes automatically a part of the charter of corporations thereafter organized."
The author cites Shiloh Turnpike Co. v. Bates,80 N.J. Law 171, and that case is supported by authorities in the opinion of Mr. Justice Parker, so that it is quite apparent that the legislature did have the right to repeal, alter and amend by virtue of the statute of 1849.
Vice-Chancellor Backes, in Bingham v. Savings Investment andTrust Company of East Orange, 101 N.J. Eq. 413 (at p. 415), citing cases, said that these cases "settled the law in this state, that articles of incorporation constitute a contract between stockholders to engage only in the enterprise stipulated to be undertaken, and for the prosecution of which they contributed their capital for mutual gain, and that any radical change in the object for which the corporation was formed, even by legislative permission or mandate, violates the obligation of their contract. In this respect the cases apply the common law of co-partnership to stockholders. They are authority for the proposition that a majority of the stockholders cannot alter their contract inter sese, though the legislature authorized it; i.e., that the reserved power of the state over corporate grants was not intended to authorize a majority of stockholders to change the contract. The doctrine is, of course, to be applied subject to the police power of the state, and it has no place if the articles of incorporation or the statute under which corporations come into being, permit such changes. The power of the state, however, under its reserve power, to alter or amend charters, in respect of the contract created between the stateand the corporation, *Page 76 
is absolute, to protect the rights of the public, carry into effect the original purposes of the grant, and to promote the due administration of corporate affairs; and if, incidently, injury to stockholders ensues, they must submit under their implied contract with the state to suffer it. The office of the reserve power, in our organic and statutory law, is to safeguard the public interests in corporate grants, which without the reservation would under the rule in the Dartmouth College Case
be an irrevocable contract. Under the reservation, Mr. Justice Gray says, in Inland Fisheries Commissioners v. Holyoke WaterPower Co., 104 Mass. 446; 15 Wall. 500, and it has been universally accepted as the true rule, the state is authorized to make any alteration or amendment in a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights which have vested under it, and that the legislature may deem necessary to secure either that object or other public or private rights."
Now then, applying the rule as laid down, the question is, does the act of 1903 and the subsequent legislation defeat or substantially impair the object of the grant (charter) or any rights that are vested under it?
The object of the charter was that a mutual loan and building association be privileged to function as such in accordance with the statutory powers, and as to "all matters not therein provided for, should be regulated by the constitution and by-law." Neither the act of 1903 nor any subsequent legislation has in any way defeated or substantially impaired the object of the grant. All that may be urged is that the revision of 1903 and subsequent acts of the legislature have regulated the manner in which the business should be conducted, and imposed restrictions on its method of conducting that business. What right has the legislature destroyed or defeated which had vested under the charter? If any "bonds" were outstanding and unpaid which had been issued prior to 1903 under the authority of section 8 of the constitution of the Association and that act attempted to destroy the validity of those bonds, the legislation would be *Page 77 
void as impairing the obligation of the contract, but in the case at hand this result is not obtained. All the act of 1903 did was to provide that in the future building and loan associations must conform to its terms that they could no longer issue preferred stock and that the only forms of stock or shares that could be issued in the future were those commonly termed running shares and prepaid shares.
It is true that the act of 1903 does not authorize the issuance of bonds by any association after that act shall take effect, and it is also true that it provides for a limitation of the right of any association to borrow money, either for the payment of maturities or otherwise, and that it provides for the form of the evidence of indebtedness for the borrowed money, to wit, notes, and that it provides for the classes or kinds of stock that may be issued and further secures mutuality by expressly declaring that there shall be no preferred stock issued, but this does not defeat or substantially impair the object of the charter. All it does is to secure a better regulated business and a greater safety to its members and the public.
Surely it may not be said that the constitution of the Association authorizing bonds in payment of maturities created a vested unalterable right in future matured shareholders to get these bonds in lieu of cash. It merely gave them a vested right, having acquired such bonds, to have them honored by payment, and this right could not be divested by subsequent legislation, but the legislature, in its wisdom, reserved the right to provide, not that the bonds already issued be dishonored, but that no association should, in the future, issue any such bonds, and this is what the legislature did, in effect, and in addition thereto, it provided that the association might issue full-paid shares, thus giving a holder of matured stock the benefit of an investment paying a certain rate or percentage and still retain a limited membership in the association and at the same time the association might have the benefit of these invested moneys to loan to its running shareholders and to meet other demands for loans from the association. *Page 78 
In State, Morris and Essex Railroad Co. v. Commissioner ofRailroad Taxation, 37 N.J. Law 228 (at p. 237), the court, through Mr. Justice Depue, said:
"It is competent for the legislature to reserve the right of alteration and repeal by general statute; and such reservation, as to future charters, will have precisely the same effect as if inserted in the charter. Under a general statute of this description, charters of incorporated companies thereafter granted, are repealable, although there is no clause in the charter reserving such right. Story v. Jersey City and BergenPlank Road Co., 1 C.E. Gr. 14; The State, Warren Railroad Co.,pros., v. Person, 3 Vr. 134, 566; Tomlinson v. Jessup, 15Wall. 454; Miller v. The State, 15 Wall. 478."
A perusal of the cited cases not only supports the text but convinces that there may be no question but that the legislature was within its rights and that the act of 1903 was a complete amendment of the fundamental law of the Association, so that there is no need of accumulating citations of later cases, other than as follows:
When the Association was incorporated the legislature said "all matters not herein provided for shall be regulated by the constitution and by-laws." The legislature left to the Association great power which it believed would be exercised in conformity with the best interests of the small investor contemplated by membership in a building and loan association. The legislature might have enacted that no preferences should be created as between members as to their shareholdings in the Association. It might have been provided, as it did in subsequent legislation, that there should be no preferred stock issued, but that full-paid stock might be, c. It saw fit to leave these things to the Association. It observed the result of its generosity. It sensed the great need of reform in the management of building and loan associations. It passed the act of 1903 and subsequent legislation to protect against abuses under the too liberal charters theretofore granted to building and loan associations.
As said by the chancellor in Bucsi v. Longworth Building andLoan Association, 119 N.J. Law 120 (at p. 124): *Page 79 
"It is a matter of such common knowledge as to require judicial notice that the operation of building and loan associations in this state during the latter part of the last century had been so loose and utterly devoid of any consideration of the purpose for which they were created and the rights of the subscribing members that the situation was a public scandal and called for action on the part of our legislature. The legislature of 1903 undertook their regulation. P.L. 1903 p. 457. The need of regulation in the public interest was obvious and the statute was enacted for the protection of the public savings under the inherent police power of the state."
Neither the act of 1903 nor subsequent legislation, in so doing, attempted to undo what had already been done by the associations, i.e., it did not attempt to abrogate contracts entered into by the associations under liberal charters, but it did seek to prevent future actions or contracts on the part of the association which would permit the association to so manage its affairs as to create preferences among shareholders and thus destroy mutuality.
Again, as said in the Bucsi Case, supra (at p. 124):
"An examination of the statute clearly evidences the intention of that legislature to strictly regulate the business of these associations and the statute contemplated throughout its provisions the central idea of co-operation, equality and mutuality upon the part of the members of the association."
In Union Pacific Railroad Co. v. United States, 99 U.S. 700;25 L.Ed. 496, the court said, speaking of the legislature:
"It might originally have prohibited the borrowing of money on mortgage or it might have said that no bonded debt should be created without ample provision by sinking fund to meet it at maturity. Not having done so at first it cannot now by direct legislation vacate mortgages already made under the powers originally granted, nor release debts already contracted. A provision now against contracting debts will not void debts already incurred. An amendment making it unlawful to issue bonds payable at a distant day without at the same time establishing a fund for their ultimate redemption will not invalidate a bond already out. * * * All *Page 80 
such legislation will be confined in its operation to the future."
Thompson, in his work on Corporations, quoting from the above case, said, section 429, page 541:
"We think it safe to say, that whatever rules congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future and may direct what preparation shall be made for the due performance of contracts already entered into."
So in the instant case, all certificates that were issued under the authority of the constitutional provisions of the Association as passed in 1869 are fully paid and satisfied and the legislation of 1903 and the subsequent legislation was merely an exercise of the right of the legislature to enact provisions which it might have incorporated in the original charter of the Association.
Having determined that the legislature, under its reserved power, had the right to amend the charter of the Association and did so by the act of 1903, the inquiry is, what power under the act of 1903 did the Association have with respect to the issuance of bonds or certificates of indebtedness, if any, and in that connection, its power to borrow money?
The act of 1903, section 19, 1 Comp. Stat. p. 338, conferred the right to borrow and circumscribed that right so that in order so to do the Association must pass a resolution by a vote of at least two-thirds of all the members of the board of directors, and further provided that the money should be borrowed on note, for a period of not longer than one year, and further provided that the money so borrowed should not be used for any other purpose than to pay a loan already made to a member of the Association, or a maturing series of stock, and further, that the total amount of money so borrowed should at no time exceed thirty per cent. of the amount then actually paid into the Association as subscriptions or dues on installment shares. *Page 81 
In 1919 the section with reference to borrowing power was amended in certain respects, but still limited the borrowing on note for one year, with a privilege of renewal of not more than one year, and also limited the purposes for which money might be borrowed.
In the revision of 1925 it was provided that a majority vote of the members of the board of directors might authorize the borrowing of money on note upon such terms and conditions as the constitution might provide, still limiting the loan to one year, with an extension of one year, provided the extension be again authorized by a resolution of the board of directors, still limiting the application of the borrowed money and the total amount permitted to be borrowed, and further provided that the Association should keep, at all times, a reserve unused of such borrowing capacity to an amount equal to five per cent. of its liability to members for payments made to it by them, and providing that no loans could be made as long as such reserve borrowing capacity remained impaired.
In 1929 the borrowing power was again amended, retaining all of the restrictions imposed by the act of 1925, and providing further that no mortgage loans could be made by any Association as long as the reserve borrowing capacity remained impaired. Laws of 1929, chapter 274, page 656, section 20.
This section was amended in 1932, chapter 96, page 166, section 20, by providing that the Association could borrow not only on notes but on mortgage or other evidence of indebtedness of such Association, but only upon terms and conditions prescribed by resolution adopted by a majority of the members of the board of directors and limiting the amount to be so borrowed to not to exceed twenty-five per cent. of the principal amount of the bond and mortgage assets of the borrowing association, and further limiting the borrowing power to one-fifth of the amount permitted to be borrowed on such obligations, as provided in paragraphs 1, 2, 5 or 6 of section 26 of that act.
This section was again amended in 1932 by chapter 16, page 28, section 20, which again permitted borrowing under *Page 82 
limitations, but only by resolution adopted by a majority of the board of directors.
A further amendment in 1933, chapter 54, page 104, section 20, again required a resolution of the board of directors.
The result of all these statutory enactments is that money could not be borrowed by the Association excepting by resolution of the board of directors, and the time for repayment was limited until 1932, and the fact is that the Association never, during the entire period from 1903 to date, authorized the issuance of bonds or certificates of indebtedness, unless it may be said, as argued by the certificate holders, that they were issued by virtue of the constitution of the Association of 1869, and a mere reading of the certificate demonstrates that they may not be said to be issued under the borrowing power conferred by the act of 1903 or any of the amendments. They are not notes, they are not temporary in character, they are not payable within one year, so that there is nothing that brings them within the description of those instruments upon which the Association, by law, was permitted to borrow money.
The amendatory and supplementary acts heretofore referred to never extended the power of the Association to borrow on bonds payable on demand or at some other unlimited time, or at some time limited by advance notice of withdrawal given to the Association by the bondholder.
The power to borrow on note having been expressly given, the power to borrow on other forms of security is certainly not necessary to the exercise of the granted power. Nor may it be said that the power to borrow on bond or certificate of indebtedness may be regarded as incidental to the right to borrow on note. The statute having expressly limited the borrowing power implies the exclusion of a right to borrow under any other form or evidence of indebtedness.
Not only did the Association not have power to borrow money secured by bonds or certificates of indebtedness, but it was expressly limited as to the kinds of stock it could issue. Section 53 of the act of 1903 so provides, as follows: *Page 83 
"All shares of stock issued by any such association of this state, or doing business therein, shall be of the same par or maturity value; no such association shall issue preferred or other than common stock, and all shareholders shall occupy the same relative status as to debts and losses of the association; but nothing herein shall forbid agreements with shareholders who pay the full par or maturity value of their shares in advance, whereby they may waive participation in the general profits of the association in consideration of a fixed annual profit."
But the holders of certificates insist that inasmuch as they did not incorporate under the act of 1903 and inasmuch as they never, by appropriate action of the board of directors, authorized the issuance of full-paid stock, and inasmuch as they never amended section 8 of the constitution, which provided for the issuance of bonds, that irrespective of the act of 1903, they continue to have the right to issue them. That this argument is fallacious is demonstrated by the remarks of Vice-Chancellor Backes in Bingham v. Savings Investment and Trust Company ofEast Orange, supra (at p. 417):
"Where the legislature authorizes a course of procedure whereby a charter may be amended, action in conformity thereto does not make the amendment, but it comes into existence through the operation of the statute. The amendment is the act of the legislature, the same as the charter, and neither has existence except as conferred by the statute. * * * It has the force of law with corporations which accept its provisions, and with those upon which it is imposed by virtue of the reserved power, against their will, unless, as we have seen, it will defeat or substantially impair the object of the grant."
It may well be that the Association, at the time it adopted its constitution in 1869, had a right to provide for the payment of maturities "either in cash or bonds bearing interest," but the legislature had reserved the power to "alter, amend or repeal" the charter rights of the Association, and this it did in the revision of 1903, so that even if the Association was clothed with authority prior to the revision, and even if the bonds issued prior thereto were legally issued, the shareholders and all others dealing with the Association after the *Page 84 
revision of 1903 did so with the knowledge that the legislature had limited the right of the Association to borrow money and denied to it the right to issue bonds or other certificates of indebtedness excepting as provided in the act of 1903. They were charged with the knowledge that even if the Association had formerly been clothed with power to issue bonds in payment of maturities, that they might no longer have that power and they were charged with the knowledge that the provisions of the constitution and by-laws permitting the practice of issuing bonds may have ceased when the revision of 1903 went into effect, and the mere fact that the Association never, by appropriate action of its board of directors, repealed that provision of the constitution and by-laws, but permitted it to stand, did not give the Association the right to continue operation under its provisions, which were violative of those of the act of 1903.
As held in Fornataro v. Atlantic Coast Building and LoanAssociation, 10 N.J. Mis. R. 1248 (at p. 1256);163 Atl. Rep. 240, while building and loan associations could make the same provisions by its by-laws as those contained in the organic or statutory law, "there was no power so to do if the provisions of the by-laws limited or attempted to transcend those of the legislative acts."
It seems clear, therefore, that the holders of the certificates in question held them, not by way of contract arising out of the old constitution and by-laws, but subject to the statutory enactments in force at the time when the certificates were issued, as heretofore noted.
As said by Mr. Justice Collins in Campbell v. Perth AmboyMutual Loan, c., Association, 67 N.J. Law 71, 72:
"The associates could not, by constitution or other agreement, override the statute. That fundamental law must control."
See, also, In re United Towns Building and Loan Association,79 N.J. Law 31.
It is also argued that the act of 1903 is merely permissive legislation in so far as building and loan associations incorporated prior thereto are concerned, and that inasmuch as *Page 85 
this Association did not re-incorporate under said act, it is not subject either to its terms or the amendments and supplements thereto.
It is true that in this act of 1903, sections 22 and 23 provided that existing associations might reorganize under the act of 1903, and that (quoting a portion of section 23, at page 464, P.L. of that year):
"thereupon such association shall be held and considered to be incorporated under this act, and shall possess all the rights and privileges and be subject to all the restrictions herein contained."
But section 56 of that act, at page 477, provided:
"The provisions of this act relating to building and loan associations of this state shall apply to all such associations organized under any laws of this state and no such association shall hereafter be incorporated except under this act; and the provisions of this act relating to building and loan associations of other states shall apply to all such associations doing business in this state and no such association shall hereafter do business in this state except according to the provisions of this act."
The result of this legislation was that while an association might, if it saw fit, reorganize under the act of 1903, if it did not desire so to do, the provisions of the act of 1903 applied to all building and loan associations "organized under any laws of this state," so that from 1903 on, the Atlantic City Loan and Building Association was operating under that act, its supplements and amendments.
The Association has accepted the supervision of the department of banking and insurance since 1899 in accordance with the requirements of the legislation of that year and has continued so to do under subsequent legislation. It has reported to that department, submitted to examinations by representatives of that department, complied with its rules and regulations, in short, accepted all the benefits of this supplementary and amendatory legislation and at all times held itself out as subject thereto, and by so doing has assented to the provisions of such legislation, and it is too late for the certificate holders claiming a preferential share status to now urge against the running shareholders the proposition that their *Page 86 
certificates, although issued after 1903, are held under the authority of the constitution of the Association of 1869 and contrary to the provisions of these subsequent legislative enactments, none of which defeat or substantially impair the objects intended to be secured by the original charter, but all of which were enacted to protect the rights of shareholders and to secure mutuality as between them, thereby preventing a situation where the one might have preferential rights over the other.
Cook on Corporations (7th ed.) § 503, in referring to the effect of amendments on a charter by subsequent legislation, said:
"Assent and acquiescence acts as a bar. Assent may be express or implied. Any acts indicating an acceptance * * * of the amendment bind. * * * Such acceptance may grow out of silence or delay."
And in Whitfield v. Kern, 122 N.J. Eq. 332 (at p. 347), the court, through Mr. Justice Heher, said: "And so, an estoppel operating upon the stockholders binds the corporation."
It is argued that even if the legislature was within its rights to alter and amend the charter of the Association and accomplished that purpose by the act of 1903 and subsequent legislation, that the Association was bound to pay maturities within a reasonable time after a series had been declared matured and that the statute does not expressly prevent payment of maturities by the issuance of bonds or certificates of indebtedness and that the Association has implied power to do anything and everything necessary to carry out its obligation to pay maturities, and "if the Association became indebted to the shareholder for the matured value of a maturity, there also can be no doubt that the Association could issue a written acknowledgment of that indebtedness."
In the first place, as heretofore noted, not one of the outstanding certificates was issued because of any inability of the Association to pay its maturities as they became due and payable. The certificates were not issued in lieu of payment *Page 87 
of maturities. They were issued under an option under which the matured shareholder took "full-paid stock" in lieu of cash and he took the full-paid stock in payment of the maturity and he took it as an "investment" and not as an evidence of indebtedness for the unpaid maturity.
Of course, the full-paid stock was a liability but the holder thereof had and has a definite and fixed status under the decisions of our court. Such a shareholder is a member of the Association and not a creditor and as such is not entitled to a preferential status. Fitzgerald v. State Mutual Building andLoan Association, 76 N.J. Eq. 137; Newark Twenty-one Building andLoan Association v. Zukerberg, 115 N.J. Eq. 579.
Again, the act of 1903 and subsequent legislation pointed out the manner in which maturities might be paid other than in cash,i.e., by borrowing money to pay them, within certain limits, and by appropriate resolution of the board of directors, and if an association, by the use of available cash and resort to its borrowing capacity, could not pay, appropriate action by the banking commissioner would ensue and in the process of liquidation unpaid maturities would then have a fixed status as such, but the issuance of a certificate of indebtedness by an association as evidence of a debt for a maturity which it was unable to pay not only is not authorized by the statute law, but the issuance thereof is not a justifiable temporary disposition of the amount due for the maturity, nor is there any implication that because maturities must be paid an association has a right to issue certificates of indebtedness therefor.
The very purpose of building and loan associations would be thwarted were this court to hold that these certificates constitute the holders thereof preferred creditors and that the Association had an implied right to issue them as such. In fact, to so hold would, in effect, lend judicial sanction to the perpetration of a fraud upon subsequent subscribers to the Association's installment shares, who, at least from 1915 on, would be entirely without notice that the holder of outstanding certificates were claiming a creditor status. *Page 88 
As said by Vice-Chancellor Leaming in Fitzgerald v. StateMutual Building and Loan Association, supra:
"The * * * act of 1903 * * * will be found to contemplate throughout its provisions the central idea of co-operation, equality and mutuality upon the part of the members of the Association. That part of section 53 * * * which provides that `all shareholders shall occupy the same relative status as to debts and losses of the Association' is but in general harmony with the general plan of the act."
It is argued that even though it be true that outstanding certificates were originally issued in lieu of cash and accepted in payment of maturities, that some of these certificates have been transferred and came into the possession of third persons who have and had no connection with the Association, and that these certificate holders hold them freed from defenses which the Association might raise as against the original certificate holders. As to this, suffice it to say that the assignees of the original certificates took under the assignments only that which the assignors had, and took subject to any defenses that might have been raised against the assignors.
My findings are that the Building and Loan act of 1903, P.L.
of that year, pages 457, 477, its supplements and amendments, constitute the fundamental law under which the Atlantic City Loan and Building Association operated and conducted its business from the taking effect of that act to date.
That from 1903 to date the Association was not empowered to issue bonds in payment of maturities and that any right the Association may have had so to do prior to 1903 was abrogated by the act of 1903 and that the legislature was not prevented from so doing by reason of any constitutional inhibition.
That inasmuch as all of the outstanding certificates in question were issued after 1903 and all that had been issued prior thereto had been fully paid prior to the insolvency of the Association, the legislation of 1903 did not impair the obligation of any contract now the subject of consideration.
That the factual situation developed by the evidence does not estop the Association from asserting that the certificates *Page 89 
in question are not bonds or certificates of indebtedness, but that the evidence demonstrates that the certificates were authorized to be issued as full-paid stock by resolution of the board of directors and were delivered to matured shareholders as such and received by them with full knowledge, either actual or implied, that notwithstanding the language in which they were couched, they were, in fact, issued as full-paid stock or income shares.
That the certificates were not evidence of indebtedness for unpaid maturities on running shares, but that they were delivered and accepted as payment pro tanto for matured shares under an option that the matured shareholder might receive payment in cash or paid-up stock.
That the full-paid stock represented by the certificates did not create a debtor and creditor relation between the Association and the holder thereof and hence did not confer on such holders preferential rights over running shareholders.
That the fact that the Association did not alter its constitution wherein it provided under section 8 that maturities should be paid in bonds or cash after the enactment of 1903, did not continue in force that section of the constitution, but that any authority the Association may have had prior to 1903 to issue bonds under section 8 aforesaid was annulled by the statutory enactment of 1903.
That the fact that the Association did not actually reorganize under the provisions of section 22 of the act of 1903 did not continue the Association as operating under its original charter provisions, but that it was at all times after the 1903 enactment subject to that act, its supplements and amendments.
That the fact that the Association did not amend its by-laws so as to authorize the issuance of full-paid stock not only did not prevent the issuance thereof by the Association, but that the Association, in fact, took advantage of the right so to do offered by the statute and may not now be held to say that by reason of the failure to change its by-laws it was not privileged to issue full-paid stock.
That the actions at law now pending against the Association, as set forth in the bill of complaint, be enjoined. *Page 90